Jose CISNEROS et al., Plaintiffs-
Appellees-Cross Appellants,

v.

CORPUS CHRISTI INDEPENDENT
SCHOOL DISTRICT et al., Defend-
ants-Appellants-Cross Appellees.

No. 71–2397.

United States Court of Appeals,
Fifth Circuit.

Oct. 7, 1971.

Richard A. Hall, J. W. Gary, Corpus
Christi, Tex., Donald L. Howell, David
T. Searls, Houston, Tex., for appellants
and cross-appellees.

Chris Dixie, Houston, Tex., James De-
Anda, Corpus Christi, Tex., Brian Lands-
berg, Atty., Civil Rights Div., Dept. of
Justice, John N. Mitchell, Atty. Gen. of
the U. S., Dept. of Justice, Washington,
D. C., for interested party.

Charles Stephen Ralston, New York
City, Mario Obledo, San Francisco, Cal.,
Edward Idar, Jr., San Antonio, Tex.,
amici curiae.

Before GEWIN, GOLDBERG and
DYER, Circuit Judges.

ON SUGGESTION FOR
HEARING EN BANC

BY THE COURT:

The Court having been polled at the
request of one of the members of the
Court on hearing en banc and a majority
of the Circuit Judges who are in regular
active service not having voted in favor
of it, (Rule 35 Federal Rules of Appellate
Procedure; Local Fifth Circuit Rule 12)
the Petition for Hearing En Banc is
denied.

1. The rights of the Negro plaintiffs are
caught up in the controversy as to the
legal status of the Mexican-American and
Anglo students in the system, and to date
they have not been accorded relief al-
though their status rests completely on an
admitted dual school premise. The United
States as plaintiff-intervenor suggests re-

Before JOHN R. BROWN, Chief
Judge, and WISDOM, GEWIN, BELL,
THORNBERRY, COLEMAN, GOLD-
BERG, AINSWORTH, GODBOLD, DY-
ER, SIMPSON, MORGAN, CLARK, IN-
GRAHAM and RONEY, Circuit Judges.

BELL, Circuit Judge (dissenting):

I dissent with regret. I think that it
is a serious error in judgment for the
court to decline to hear this case en banc.
It presents some quality of justice con-
siderations which are of particular im-
portance in the time of stress now ex-
isting as school boards and courts seek
appropriate ways and means to desegre-
gate urban school systems. But of more
importance, it presents questions of first
impression in this court in the field of a
non-dual system and non-de jure segre-
gation. We have here a Mexican-Ameri-
can and Anglo segregation problem in a
school district where school segregation
between the two groups has never been
required by law. Indeed, we have a
school district in which every school
was integrated as between the two groups
at the time of the decision in Brown v.
Board of Education, 1954, 347 U.S. 483,
74 S.Ct. 686, 98 L.Ed. 873.[1] The order
of the district court setting forth the
remedy required has been stayed by
Justice Black, 404 U.S. ——, 92 S.Ct. 9,
30 L.Ed.2d 15 and the matter is pres-
ently pending in this court on the mer-
its. A copy of Justice Black's order
is attached as Appendix A. This stay is
based on a view that the circumstances
of the case " * * * present a very
anomalous, new and confusing situation."

*Quality of Justice Considerations*

The school board moved to have this
matter heard by the court en banc. The
following facts demonstrate to me that
justice would be better served from the

mand to the district court for further
evidentiary hearings regarding discrimina-
tion against Mexican-Americans and also
to consider the scope of the remedy on
the basis of adjusting it to the scope of
such discrimination as is found. However,
immediate relief is urged for the Negro
students.

standpoint of the school board, and derivatively the taxpayers and citizens of the Corpus Christi school district, believing, when the final order comes, that the matter has received the reasoned attention of the federal court system. This is not to say that the panel hearing this matter will not give it reasoned attention; it is to say that prior events might cause the school district, as it apparently has, to seek a broader forum. The following outline should suffice to make this point:

(1) Suit was filed on July 22, 1968, by Negro and Mexican-American plaintiffs. They alleged that Negro students had been segregated by law prior to 1954. As to Mexican-American students, and Negro students after 1954, it was alleged that they were segregated through the establishment of school boundary lines by the school district. The schools maintained for Negro students prior to 1954 had been "phased out." It was further alleged that segregation existed in the form of requiring Negro and Mexican-American students to attend schools together while Anglo students attended predominantly Anglo schools. This was referred to in the complaint as de facto segregation.

The prayer for relief sought no racial balance and was in fact adjusted to the discrimination claimed. Plaintiffs sought an order to prevent discrimination on the basis of race, color or national origin through the utilization of plant, equipment and curricula, disproportionate assignment of teachers and staff, and in schoool building construction. They sought to enjoin defendants from establishing and maintaining school zones or boundary lines that discriminate. This prayer was expanded in a proposed pretrial order dated May 14, 1970 to require defendants to fully integrate the school system. No distinction was drawn between Negro and Mexican-American students.

The facts were that before 1954, the district was comprised of 39 schools, 3 for Negro students and 36 for the remaining students—each of the 36 having student bodies comprised of Anglo and Mexican-American students. It appears that by 1969, the demography of the system was such that one high school out of five was predominantly Mexican-American although there were some Negro and Anglo students in attendance (M-A 1363, N-168, A-58). There were 12 junior high schools and four of these were predominantly Mexican-American although each had a small number of Negro and Anglo students. There were 43 elementary schools and 16 of these were predominantly Mexican-American.

The system-wide racial ratio in 1969 was as follows out of a total of 46,023 students: Elementary — 50.78%-M-A, 43.44%-A, 5.78%-N; Junior High — 46.71%-M-A, 48.01%-A, 5.28%-N; High — 38.87%-M-A, 56.42%-A, 4.71%-N. In 1969 there were 21,806 Anglos, 21,719 Mexican-Americans and 2,475 Negro students in the system. This was up from 13,668 Anglos, 11,883 Mexican-American and 1,342 Negro students in 1954. These statistics are based on using a school census of Spanish and Anglo surnames. (No comment is necessary on the unreliability of such an approach.)

(2) On June 4, 1970, the district court entered a "partial final judgment" enjoining defendants from discriminating on the basis of race, color or ethnic origin in the assignment of students, teachers and staff to the various schools of the district, and requiring certain affirmative action including a desegregation plan. This judgment was based on an opinion rendered on the same day, now reported as Cisneros v. Corpus Christi Independent School District, S.D.Texas, 1970, 324 F.Supp. 599. The court concluded that the Mexican-Americans had been relegated to dual school system status. At another point the court referred to the school system as being segregated and dual with "its real roots in the minds of men" in that the school district failed " * * * to anticipate and correct the [racial] imbalancing that was developing."

The only findings pointing to affirmative discrimination relate to the drawing

of boundary lines in a total of two schools out of 61. Other discrimination found to exist falls in the category of increasing racial and ethnic imbalance through the location of new buildings (two), and through renovating existing buildings (four), in recent years on a neighborhood basis. The court also found discrimination in allowing students to transfer under "Student Emergency Transfer Applications." This involved a total of 200 transfers. Discrimination was also found with respect to one school in the use of an option assignment plan, and in failing to employ what the district court considered to be a sufficient number of Mexican-American teachers and staff. The last finding of discrimination is based on the failure of the school district to adopt a majority to minority transfer rule, a concept of recent origin in dual school system integration techniques.

At this point, June 4, 1970, the district entered the necessary certificate for an interlocutory appeal under 28 U.S.C.A. § 1292(b).

(3) On July 10, 1970, this court denied the interlocutory appeal in a two judge order.

(4) On July 13, 1970, this court denied a stay of the district court order in a two judge order.

(5) On July 2, 1971, after an extended hearing the district court entered a comprehensive student assignment order requiring the district to transport 15,000 students out of their former places of school assignment. The district had a total of nine buses transporting 400 students at the time. The district court computed the number of buses needed on the basis of two round trips daily of buses having a seating capacity of 72 students and with 12 extra students to stand on each trip. This came to a need of 96 buses costing $1.7 million. The district court was aware of the difficulty if not the impossibility of obtaining the necessary funds and of the delay in procuring the buses even if the funds could be first obtained. Nevertheless, the court deemed these difficulties insufficient in face of the need, as the court saw it, to disestablish the "neighborhood school concept of the system" and to distribute the "burden of integration" throughout the system. After decreeing that no school could have less than an 80–20 racial ratio, Mexican-American and Negro as one group and Anglo as the other, the court ruled that no stay would be granted pending appeal. As a preamble to this order, the district court had recited the fact that this court had denied an interlocutory appeal although such a course had been suggested by the district court.

The district judge in charge then left the district. This left the school board in an unfortunate position, given the denial of the stay and having in mind the uncertainty of funds and buses to carry out the order.

(6) Despite this, the school district sought a stay in the district court and the matter was assigned by the Chief Judge of the district to an available district judge who on July 16, 1971, granted a stay as to the remedy insofar as additional time was needed to obtain funds, buses, and to accomplish the remodeling of buildings, changes in curriculum, library facilities, and teaching assignments, all necessary under the order.

By a supplemental order dated July 17, 1971, the district court made it clear that the stay was only as to Mexican-American and Anglo students affected by the order of July 2, 1971.

(7) This court then vacated the order of the district court which had granted the partial stay. (Two judge order dated August 5, 1971).

This order had the effect of substantially mooting the appeal from the standpoint of remedy since it meant that the buses had to be immediately purchased and the 15,000 students reassigned and transported.

(8) On August 19, 1971, Justice Black reinstated the partial stay which had been granted in the district court.

(9) On August 23, 1971, the district court broadened its stay to include Negro

students as well as Anglo and Mexican-Americans. See footnote 1, supra.

(10) On August 23, 1971, the appeal of the school district was set for hearing before a panel of this court on September 8, 1971.

(11) On August 25, 1971, the school district moved to have the case considered en banc by this court.

While not entitled to such consideration as a matter of denial of procedural due process, it is apparent why the school district would want to avail itself of the rules of this court as to en banc hearings so as to have a broader forum, given the denial of the interlocutory appeal presenting a question of first impression and particularly given the effective mooting of a large portion of the appeal by vacating the stay of the district court. Without more, however, this would probably not warrant en banc consideration but there is more.

*Substantial questions of first impression are presented.*

Justice Black noted that this case presented questions not heretofore passed on by the Supreme Court.[2] These questions are new and have not been passed on by this court.

There are in fact two new questions. First, what is to be the test in determining the question of discrimination vel non in a non-dual school system, i. e., one which has never been segregated by law? This question is confused by the fetish to give names to legal doctrines —here de jure-de facto. We generally refer to de jure school segregation as that where students are or were segregated pursuant to state statute. The district court found some discrimination in a de facto school situation (as to Mexican-Americans), and leaped across the factual chasm to find de jure status. A de jure remedy was then applied. It

would seem that the more appropriate approach would be to determine in the first instance whether and to what extent discrimination exists.

If discrimination is found, then the second question is remedy. Should the remedy be commensurate with the particular determination found to the end of eliminating that discrimination, or should the entire school system be reconstituted notwithstanding the degree of discrimination. To put the question simply, should the school system of a large city be reconstituted in its entirety although the discrimination may have been restricted to one or only a few schools? Stated differently, do isolated instances of discrimination taint the entire system?

These are important questions. Many school children are involved. We resolved en banc most of the questions involved in desegregating de jure systems. Singleton v. Jackson Municipal Separate School District, 5 Cir., 1969, 419 F.2d 1211. This proved to be an effective approach in an area of law much in the public interest and involving one of our most important social institutions—public schools. We should do the same now that new questions involving non-dual systems are presented.

Moreover, under the teaching of Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, there is also the question in this case as to whether the remedy may include an obligation to continuously reconstitute a school system where non-discriminatory resegregation occurs due entirely to changes in residential patterns. Swann would seem to teach otherwise. 402 U.S. at 31, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.

In the interest of stability in the field of public education, I would meet and

---

2. See Gomperts v. Chase, 404 U.S. —, 92 S.Ct. 16, 30 L.Ed.2d 30 (1971), where Justice Douglas in denying a stay to plaintiffs in a de facto school situation case noted that " * * * the precise contours of *de jure* segregation have not been drawn by the Court." Historically that has only been where " * * * segregation was a mandate by the legislature, carried into effect by a school board, whereby students were assigned to schools solely by race."

resolve these questions now as a whole court.

## APPENDIX A

### SUPREME COURT OF THE UNITED STATES

CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT et al. v. JOSE CISNEROS et al.

Application For Reinstatement Of Stay Ordered By The United States District Court For The Southern District of Texas

[August 19, 1971]

Mr. Justice Black, Circuit Justice.

The district judge in this case ordered the Corpus Christi Independent School District to stop alleged historical practices of discrimination against school children on the basis of race or color. He directed how this was to be accomplished, saying at the same time that he would grant no stays of his order. The school district asked the court to stay its order and a stay was granted by a different district judge who had been assigned to hear the application. The plaintiffs, parents of the students allegedly discriminated against, then asked the United States Court of Appeals for the Fifth Circuit to vacate the stay. A panel of two Circuit Court judges did vacate the stay. The school district then applied to me as a single Justice to reinstate the District Court's stay. The Solicitor General of the United States has joined in requesting me as a single Justice to reinstate that stay. If I reinstate the stay, the District Court's order will not go into effect until the Fifth Circuit or this Court has had an opportunity to pass on it.

It is apparent that this case is in an undesirable state of confusion and presents questions not heretofore passed on by the full Court, but which should be. Under these circumstances, which present a very anomalous, new, and confusing situation, I decline as a single Justice to upset the District Court's stay and, therefore, I reinstate it without expressing any view as to the wisdom or propriety of the Solicitor General's position. The stay will be reinstated pending action on the merits in the Fifth Circuit or action by the full Court.