**NEWELL COMPANIES, INC.**

v.

**KENNEY MANUFACTURING COMPANY.**

Civ. A. No. 82–0421.

United States District Court, D. Rhode Island.

April 4, 1985.

John H. Blish, Edwards & Angell, Providence, R.I., James G. Staples, Baker & McKenzie, Chicago, Ill., for plaintiff.

James P. Marusak, Thomas D. Gidley, Hinckley & Allen, Providence, R.I., Robert B. Russell, Russell & Tucker, Boston, Mass., Lars I. Kulleseid, Kenneth B. Herman, Fish & Neave, New York City, for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiff in this case, Newell Companies, Inc. (Newell) sued Defendant Kenney Manufacturing Company (Kenney) for alleged infringement of claims 1, 2, 6 and 7 of its patent 4,006,770 (the 770 patent) for a do-it-yourself-without-tools window shade. Kenney denied infringement and asserted the defenses of invalidity due to obviousness and noninfringement. Other defenses and counterclaims which were raised by Ken-

ney were either withdrawn or directed out by the Court at the end of testimony.

At the close of Plaintiff's case-in-chief, Defendant Kenney moved for a directed verdict on the grounds that the 770 patent is invalid due to obviousness, and that Kenney's accused structure does not infringe any of the claims of the patent. This motion was renewed at the close of evidence in the case. The Court reserved decision on the motion and submitted the case to the jury after appropriate instruction. The jury found the claims valid and infringed by Defendant. The Court must now address the directed verdict motion upon which it reserved decision.

 Whether a directed verdict motion should be granted is a question of law which must be determined by the Court. *See* Fed.R.Civ.P. 50(a). A directed verdict should be granted sparingly, since it denies the parties the opportunity to have the facts determined by a jury. 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil § 2524 (1971)*. The standard applied by the Court is whether there is evidence upon which the jury could properly find a verdict for the party against whom the motion is directed. *Id.* This standard is the same for both a motion for directed verdict and a motion for judgment notwithstanding the verdict. *Id. See also Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546 (Fed.Cir.1983). The Court must (1) consider all the evidence; (2) in a light most favorable to the nonmoving party; (3) drawing reasonable inferences favorable to the nonmoving party; (4) without determining the credibility of witnesses; and (5) without substituting its judgment for that of the jury on conflicting evidence. *Connell, supra* at 1546. *See also Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.1984); *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1512–13 (Fed.Cir.1984). If, after applying these guidelines, the Court is convinced upon the record before the jury that reasonable persons could not reach a verdict for the nonmoving party, it must grant the motion for a directed verdict. *Connell, supra* at 1546.

 The Court finds that reasonable jurors could not conclude that claims 1, 2, 6, or 7 of the 770 patent are valid, and thus will grant the motion for a directed verdict on the issue of invalidity. While a defendant cannot be held legally liable for infringing an invalid patent, *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed.Cir.1983), the Court also will address Defendant's motion on the issue of noninfringement in the interest of judicial economy.[1] *See Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1576 (Fed.Cir.1984); *Medtronic, supra* at 1582–83. Since no reasonable jury could conclude that claims 1, 2, 6 or 7 of the 770 patent were infringed, the Court will grant the motion for a directed verdict on the issue of noninfringement, as well.

### FACTS

The window shade industry has existed for over 100 years. Shades were first made of cloth, starched cloth, or paper, but by 1973 vinyl was the predominant material used. For the most part, wooden or hollow rollers were used, although convolute cardboard was also utilized. The rollers contained a spring motor on the left side and had a pin to support the shade on the right. A pocket in the bottom of the shade enclosed a rigid slat.

In the 1970's as now, Newell was involved in the manufacture of window shades. Other companies in the field included Joanna-Western, Clopay, Graber and Breneman. The practice in the industry was to manufacture shades which were cut to measure on a machine by trained store personnel, rather than by the consumer at home. The consumer would first measure the window for which a shade was required and bring the dimensions to the store, where he or she would choose a new shade. Since window shades were available in a limited variety of sizes, the shade chosen would often have to be reduced in

---

1. The parties to the instant suit also urge the Court to rule on both issues.

size. In the case of a wooden roller the cap and pin would be removed from the end of the roller, the shade material would be cut and removed, the roller and slat sawed to the required length and the end cap replaced on the roller. After the shade had been cut, the consumer would take it home. If the shade were improperly cut or if the measurements were incorrect, the consumer would return the shade and try again. Frequently the store would bear the loss attributable to a miscut shade. Until the time of the claimed invention, store-cut shades were the state of the art.

Then in late 1973 or early 1974 Thomas Ferguson, the products manager of Newell's window shade division, saw a vinyl material manufactured by Sean Corcoran. This material was scored partially through in parallel lines so that it could be torn to a desired width. On February 12, 1974 Mr. Ferguson wrote to Mr. Corcoran, who resided and had his business in Ireland, and requested sample shades. Mr. Corcoran sent the shades, along with a separate cover letter and instructions on February 25, 1974. In his letter, Mr. Corcoran indicated that he would not have the output to supply Newell until 1975 and that at the time rollers were in better supply and cheaper in America. Mr. Corcoran suggested alternatives to his supplying the completed shades: sending only the shades and attaching rollers in the United States or entering into a licensing agreement. The instructions illustrated the process of measuring and assembling the shade. They contemplated the use of a wooden roller and slat, each of which had to be sawed to length. The window shade had to be cut through at the slat pocket, since the seam for the pocket was solid and overlapped the scoring in the shade material.

Ferguson sensed potential for developing a new product and began to work on designing a window shade on his own time. He decided to attach the vinyl to a telescoping roller in order to simplify the procedure of assembling the shade. He was faced also with the challenge of designing a slat pocket that would enable the width of the vinyl to be reduced the entire length of the shade without the use of scissors or other cutting implement. Here Ferguson's wife, who had considerable sewing skill, contributed to the design. She recommended sewing the slat pocket with an intermittent seam so that the stitching would not overlap the slits in the material. This feature was incorporated into the final design.

In April 1974 Ferguson presented his idea to his superiors at Newell. Newell's new product committee decided to pursue the shade, and prepared to test its market potential. Since Newell did not manufacture its own shade in 1974, it arranged for Breneman, which manufactured other Newell products, to make the test shades. Corcoran sent enough vinyl to make the shades and Breneman developed a heat sealing bar for the slat pocket. Newell purchased rollers made by Clopay and described *infra*, removed their cardboard sleeves and used the rollers for the test shades.

The test of the window shade had positive results and Newell decided to introduce its product. At this point a complication arose when Breneman, assuming the product was destined to be unsuccessful, declined to manufacture the shades for Newell. Newell decided to manufacture the shades itself and began selling the shades in October of 1975. On June 16, 1975, before the mass selling of the shade began, Ferguson applied for a patent. This application would ripen into the 770 patent, the subject of this controversy.

The do-it-yourself-without-tools window shade was successful with consumers immediately upon its introduction. Competitors, some of whom had been aware of the Corcoran material before Newell introduced its shade, hurried to enter the market. Breneman attempted to import a copy of the Newell shade from Taiwan but was prevented from doing so by litigation. Within one year of Newell introducing its shade, Graber and Clopay entered the market. The Graber shade, called Easy-Up, was a copy of Newell's product except for the motor attachment. Clopay's shade,

Sure Fit, functioned much the same as Newell's but included the roller described under the Gossling patent number 3,203,-468, *infra*. Joanna-Western brought out the Perfit shade, Stanley the Trim 'N Fit, and Breneman a shade called Strip 'N Fit.

In 1981 Defendant Kenney entered the market after K-Mart, one of its principal customers, informed company officers that it wanted to sell tear shades and that, as of July 1981, it would buy drapery hardware, which made up a large part of Kenney's business, only from a company which could also supply do-it-yourself-without-tools window shades. In July of 1981 Kenney delivered its shade to K-Mart. The shade was similar to that manufactured by Newell, except that the shade material was not attached to the smaller roller, but allowed to wrap loosely around it.

At the date of this trial Breneman, Joanna-Western and Stanley had withdrawn their products from the market. The other products discussed remain.

## VALIDITY OF PATENT

Not every invention is patentable. In order to be patentable, an invention cannot be obvious. 35 U.S.C. § 103 (1982). Under 35 U.S.C. § 103, an invention is obvious ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The court in *Graham v. John Deere Company*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), delineated the factors to be considered in determining the obviousness of a claimed invention. The so-called "primary" factors listed by the court are the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art. *Id.* Other factors, denominated "secondary considerations" by the court, are commercial success, longfelt but unsolved need, and the failure of others. *Id.* Although the court

in *Graham v. John Deere Company* stated that "Such secondary considerations ... might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented[,]" *id.* at 17–18, 86 S.Ct. at 694, it is clear today that all these factors must be taken into consideration when dealing with the issue of obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir.1983); *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 695 (Fed.Cir. 1983).

> Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*Stratoflex, supra* at 1538–39.

■ The Court in embarking on its analysis is mindful of the fact that a patent is presumed valid, 35 U.S.C. § 282 (1982), so that a patent holder never is required by law to prove facts establishing validity. *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1511 (Fed.Cir.1984). The question confronting the Court, then, is whether patent challenger Kenney met its burden of establishing invalidity by clear and convincing evidence, *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed.Cir.1984), so that reasonable jurors could not conclude that the claims of the 770 patent are valid. *See Railroad Dynamics, supra* at 1511. If such is the case, the motion for a directed verdict should be granted on this issue. *See id.*

## THE VALIDITY EVIDENCE

(a) The 770 Patent.

1. Specification

The 770 patent teaches an extensible and retractable window shade assembly which may be adjusted to a desired width without the use of tools. This window shade was

invented by Thomas Ferguson, who assigned the patent to Newell. The invention is described in the specification and accompanying drawings, one of which is set forth in the Appendix.

The specification discloses shade material which has a plurality of tear lines parallel to one edge of the material. The lower portion of the material is folded over to form a pocket which is seamed at its top. The seaming is intermittent and does not overlap the tear lines. This facilitates the process of narrowing the material to a desired width.

An extendable bottom slat comprised of three sections is inserted into the bottom pocket. The two outer sections of the slat are substantially identical and made of a lightweight rigid material such as plastic or metal. The center section is also made of lightweight material and fits snugly inside the end sections. The length of the slat can be adjusted to conform to the width of the shade by inserting the center section of the slat telescopically into the other sections.

The roller of the window shade assembly consists of two telescoping sections. One section is a hollow tube with an overlap seam so that the outside of the tube is substantially smooth and the internal surface has a ridge with a rectangular cross-section. The inner roller section is seamed in a similar manner and has a recess with a rectangular cross-section. This recess is slightly wider than the interior ridge on the first section. Both tubes are substantially the same diameter from end to end, with the exception of the recess on the exterior of the inner roller section. When the inner section is inserted telescopically into the outer one, the ridge and recess are aligned and serve to interlock the sections in their relative positions. This prevents the sections from rotating in relation to one another.

The power necessary to retract the shade is supplied by a spring-driven motor and a motor adaptor. The adaptor, which has several rib-like protrusions with a forward-slanting section, is inserted into one end of the outer roller section. The adaptor's diameter is slightly greater than the interior diameter of the roller section; this provides for a snug fit upon insertion of the adaptor. The ribs are separated widely enough to accommodate the ridge on the inside of the tube. When the adaptor is inserted, the adaptor and the ridge interlock, preventing rotation of the adaptor relative to the roller section.

An end pin adaptor is inserted into the outer end of the inner roller section. The diameter of the adaptor is slightly larger than the internal diameter of the roller so that the adaptor will fit snugly into the roller. Like the motor adaptor, the end pin adaptor has ribbed sections. The recess in the roller interlocks with the ribs, preventing rotation between the adaptor and roller section. An end pin is inserted into a hole in the center of the end pin adaptor.

Both roller sections are covered with a strip of adhesive along the outside longitudinal surface. The adhesive on the inner roller section is covered with a strip of protective material. When the shade is initially attached to the roller, it is attached only to the outer roller section. To complete the assembly of the shade, the purchaser marks the desired width of the shade by holding the shade up to the window to be fitted. He then adjusts the roller to correspond to the desired width. The shade is unrolled, a tab grasped, and the shade torn along the slit corresponding to the width required to fit the window. The bottom slat is then adjusted to the new shade width. The protective stripping is removed from the portion of the inner roller section which extends beyond the outer section. Finally, the portion of shade material overlapping this portion of adhesive is pressed onto the adhesive.

2. Claims at Issue.

In the original patent application, Thomas Ferguson made his first claim as follows:

 1. A window shade comprising in combination, a sheet of flexible material having a plurality of vertical tear lines, a

support roller comprising first and second telescoping sections, means for attaching said sheet of material to said telescoping sections, a pocket for housing a bottom slat, and an adjustable length bottom slat.

This claim was rejected by the Patent Office on the basis of the prior art. One of the reasons given by the patent examiner was that it was obvious to provide tear lines to the telescoping roller for window shades taught by the Rice patent, which is discussed *infra*. The examiner also cited the 1965 and 1967 Gossling patents to show the state of the art. The Gossling patents, described *infra*, claim a window shade having a telescoping roller whereby the shade material is attached directly only to the outer roller section.

Ferguson then amended claim 1 to read as follows:

Claim 1 (Amended) A window shade comprising in combination, a sheet of flexible material have two end sections and two side edges and a plurality of tear lines substantially parallel to said side edges, a support roller comprising inner and outer telescoping sections, adhesive surfaces on external wall surfaces of said inner and outer sections for adhesively securing one end section of said sheet to said inner and said outer telescoping sections, a pocket formed in the other end section of said sheet for housing a bottom slat, and an adjustable length bottom slat.

In explaining his amended claim 1, Ferguson stated that he had "deleted the reference to the broader designation 'means for attaching ...' and ha[d] substituted 'adhesive surfaces on external wall surfaces of said ... telescoping sections for adhesively securing....'" Ferguson submitted that the prior art neither disclosed nor suggested a telescoping roller with adhesive surfaces for securing the sheet to the roller. He claimed that the adhesive mode of securement was a marked improvement because it is a relatively quick and inexpensive way of making the attach-

ment, and allows a portion of the shade material to be readily removed.

Claim 1 was again rejected by the patent examiner as unpatentable over the prior art. The examiner stated that it was old to provide a window shade with tear lines and an adhesive means of securing the shade to the roller.

In response Ferguson cancelled claim 1 and substituted the following claim:

1. In an extensible and retractable roll window shade assembly which is width adjustable and installable by the consumer without the use of tools or cutting elements, the cominbination of

a telescoping roller assembly, said telescoping roller assembly including

a first roller section

said first roller section having a constant external diameter from end portion to end portion,

the outer end portion of said first roller section having first means for supporting the window shade assembly from a first support location,

the inner end portion of said first roller section having an opening therein of a size to receive

a second roller section,

said second roller section having a constant nominal external diameter from end portion to end portion,

the outer end portion of said second roller section having second means for supporting the window shade assembly from a second support location,

said second roller section being telescopically, slidably received within the first roller section

whereby the length of the roller assembly can be adjustable within the limits of the range of telescoping movement,

means for precluding relative rotation between the first and second roller sections,

a shade of flexible sheet material,

a first portion of the upper end of the shade being secured to the first roller section,

one side portion of the shade having a plurality of lines of weakness which

extend from the upper end of the shade to the lower end of the shade whereby the width of the shade can be adjusted to a desired width by separating a portion of the side of the shade from the balance of the shade, said separated portion being bounded, on the outside, by the original shade edge and, on the inside, by a line of weakness along which said portion is separated from the balance of the shade, said first and second telescoping roller sections being adjustable to an overall length which is at least as wide as the length of the final shade width without severance of any portion of either section,

*securement means for securing the second portion of the upper end of the shade, which is generally aligned with the second roller section, in fixed relationship to the second, smaller external diameter roller section with a substantially constant securing force from point to point along the length of the portion of the second roller section which extends beyond the end of the first roller section,

whereby the positions of the first and second roller sections are fixed with respect to one another and to the shade throughout the entire area of overlap of the shade and the roller assembly.

(asterisk added).

In arguing for the validity of his substituted claim, Ferguson relied primarily upon the fact that neither Rice nor Gossling disclosed a window shade which could be adjusted in width without using tools. This claim was allowed, and became claim 1 of the 770 patent.

The other claims at issue—claims 2, 6, and 7, as finally allowed—are dependent upon claim 1, which in essence teaches the window shade assembly, with telescoping roller and slat and a tear shade attached to the roller. Dependent claim 2 specifies lines of weakness in the shade material extending less than the depth of that material.[2] Dependent claim 6 specifies that the shade be made of a plastic material which makes the cut lines almost undiscernible to the naked eye,[3] and dependent claim 7 adds the intermittently sealed slat pocket.[4]

3. Claim Construction.

■ Making a determination as to the scope of a claim at issue is usually a question of law to be decided by the Court. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671 (Fed.Cir.1984). However, when the meaning of a term of art contained in a claim is disputed, and extrinsic evidence is required to explain its meaning, the issue of claim construction can be left to the jury. *Id.* at 672.

Here the parties disagree as to the meaning of the "securement means" element of claim 1 (marked with an asterisk), a term which is incorporated by reference into the

---

**2.** Claim 2 reads:
The extensible and retractable roll window shade assembly of claim 1 further characterized in that
said lines of weakness comprise continuous cut lines in which the depth of cut is less than the thickness of the shades throughout at least substantially the entire distance from the lower end to the upper end of the shade.

**3.** Claim 6 reads:
The extensible and retractable roll window shade assembly of claim 1 further characterized in that
said shade is composed of a plastic material having memory properties whereby the cut lines are virtually undiscernable [sic] to the naked eye.

**4.** Claim 7 reads:
The extensible and retractable roll window shade assembly of claim 1 further characterized by and including
a slat pocket at the lower end of the shade, said slat pocket being formed by doubling the lower end of the shade upon itself,
said doubled back portion being secured to the balance of the shade at discrete securement locations,
the securement locations associated with the side portion of the shade having the aforesaid lines of weakness therein being located between said lines of weakness whereby severance of a side portion of the shade along a line of weakness will not intersect a securement location.

remaining claims at issue. Plaintiff Newell argues that "securement means" in the context of claim 1 describes any means to secure the shade material to the inner telescoping roller section. In support of its interpretation, Newell contends that the ordinary English meaning of the words "securement means" encompasses any means that secures the shade material in a manner defined by the claims, and is not limited to adhesive. Defendant Kenney, on the other hand, argues that "securement means," as used in the claim, is limited to an adhesive mode of attachment. Kenney bases its argument upon the specification and accompanying drawings, along with distinctions made between the claimed invention and the prior art in the course of prosecuting the patent.

 Since the language of the claim at issue is in dispute, it is appropriate to consult other pertinent evidence in addition to the claim language itself. *See McGill, supra* at 673. The Court of Appeals for the Federal Circuit tends to examine all evidence relevant to a claim, including the prosecution history, *McGill, supra* at 673–74; *SSIH Equipment S.A. v. United States International Trade Commission,* 718 F.2d 365, 376 (Fed.Cir.1983), the patent specification, *McGill, supra* at 674; *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569–70 (Fed.Cir.1983), other claims in the patent, *McGill, supra* at 674–75; *Fromson, supra* at 1570, and expert testimony. *McGill, supra* at 675; *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759–60 (Fed.Cir.1984). Here the evidence can lead to only one conclusion: that the term "securement means" as used in claim 1 encompasses only an adhesive form of securement. The dispositive evidence is the patent specification and the other claims of the patent.

When looking at the words of a claim, they " 'will be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently'." *Envirotech, supra* at 759 (quoting *Universal Oil Products Co. v. Globe Oil & Refining Co.,* 137 F.2d 3, 6 (7th Cir.1943), *aff'd,* 322

U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944)). *Webster's Seventh New Collegiate Dictionary* 780 (1967) defines the term "securement" as being "the act or process of making secure," with "secure" meaning "to make fast: seal." *Id.* Thus "securement means" is a method of fastening.

A claim also must be construed in light of the specifications of the patent. *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). Here, the construction of the term "securement means" is limited by the patent law tenet that when an element in a claim for a combination is expressed as a means or step for performing a specified function, without reciting the supporting structure, material or acts, such a claim is construed to cover the corresponding structure, material or acts described in the specification and its equivalents. 35 U.S.C. § 112 (1982). The language at issue is just such an element in a claim for . a combination, the combination being the Ferguson window shade. Under this provision, Ferguson expressed the "securement means" element of claim 1 without specifying the securing material to be used. His preferred embodiment as set forth in the specification, one where adhesive means is used to attach the shade material to both the inner and the outer roller sections, leads to the conclusion that "securement means" in claim 1 is used to describe only an *adhesive* form of securement of the shade material to the roller sections, *see Coleco Industries v. United States International Trade Commission,* 573 F.2d 1247, 1253 (C.C.P.A. 1978), and its equivalents.

 Moreover, claim 5 of the patent further sustains this interpretation. Claims in a patent other than the one at issue can be used to determine the scope of the claim at issue. *McGill, supra* at 674; *Fromson, supra* at 1570. "Where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement." *Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 770 (Fed.Cir.1983) (citations omitted). Here

claim 5 of the Newell patent limits the means of securing the window shade to the inner roller section to an adhesive substance covered by a protective member.[5] Thus the "adhesive covered by a protective member" limitation cannot be imposed upon broader claim 1. The fact that claim 5 limits its securement means to an adhesive substance covered by a protective member, rather than to all adhesive forms of attachment, supports the conclusion that claim 1 is confined to adhesive securement means. If claim 1 was not so limited, logically one would expect that an additional dependent claim would have been submitted claiming a shade where an adhesive form of attachment without any protective covering was used to secure the shade material to the roller.

An examination of the evidence relevant to the interpretation of the "securement means" language in claim 1 and the context in which it is used could lead a reasonable jury to only one conclusion—that the term "securement means" encompasses only adhesive methods of securement. Although the term "securement means" when standing alone is much broader in coverage, the fact that the patent specification and drawings contemplate only adhesive securement, and claim 5 goes on to reference an even narrower form of adhesive securement makes it clear that claim 1 contemplates only an adhesive mode of securement.

(b) Scope and Content of Prior Art.

The pertinent prior art introduced at trial included three patents, as well as the Corcoran material. A description of this prior art evidence follows.

5. Claim 5 reads:
 The extensible and retractable roll window shade assembly of claim 1 further characterized in that
 said securement means comprises an adhesive substance carried by the second roller section at locations commencing at the outer end portion thereof and extending inwardly substantially the entire length of said second roller section when it is extended to its maximum length with respect to the first roller section, and

### i. The Rice Patent

The Rice patent, issued on February 21, 1933, claims a telescoping metal roller for window shades and the like. The roller consists of two sections of metallic tubing whose outer ends are of the same diameter. Each section contains a surface channel or groove which is adapted to receive the beaded edge of window shade material. The bead-receiving channel creates a ridge on the inside of the outer roller section, with the channel on the inner roller section receiving the interior ridge of the outer roller section. This enlarged channel removes metal from the periphery of the inner roller section, thus constricting its diameter so that it can be inserted telescopically into the outer roller section.

### ii. The 1965 Gossling Patent

The 1965 Gossling patent, number 3,203,-468, was issued on August 31, 1965 and assigned by the inventors to the Clopay Corporation. It claims a window shade having a telescoping roller. One roller section is tubular, with the other inner section having one end seated within this outer tubular roller section. A paper tube, or tube made of other readily cuttable material, surrounds the inner roller section. This tube, whose inner edge abuts the outer roller section, is not affixed to the inner roller section in any way. An adhesive strip is attached to the outer roller section and the paper tube, holding the tube in place so that it forms, in effect, an extension of the outer roller section. This adhesive strip prevents the paper tube from rotating in relation to the outer roller section so that the shade does not droop when it is in a hanging position. The adhesive

 a temporary protective member overlying the adhesive substance at all points,
 said temporary protective member being removeable [sic] by hand from contact with the adhesive substance throughout that portion of the length of the second roller section which extends beyond the inner end of the first roller section,
 whereby the adhesive substance may remain unactivated until just prior to securement of the second portion of the upper end of the shade to the roller assembly.

strip also attaches the window shade to the outer roller section and the paper tube.

### iii. The 1967 Gossling Patent

The 1967 Gossling patent, number 3,299,944, issued on January 24, 1967, is a division of the 1965 Gossling patent. Both patents claim a window shade having a telescoping roller and were assigned by the inventors to Clopay Corporation. The primary difference between the 1965 and 1967 patents is that the 1967 patent does not teach the use of a cuttable tube to surround the inner roller section. Instead, the shade material is attached adhesively only to the outer roller section. The material then is wound onto the roller slightly more than one full turn and a second layer of adhesive is applied to the shade material along the whole length of the roller. The shade material is wound onto the roller to cover the second adhesive application. This causes the shade material to stick to itself and form a tube-like structure around the inner roller section. This formation is not adhered to the inner roller section, which remains free to be fitted telescopically into the outer tubular section.

### iv. The Corcoran Design

Corcoran material was used by Ferguson when designing the window shade taught by the 770 patent at issue, although Ferguson did not designate the shade material described in his patent as Corcoran material by name. The Corcoran material is described in a patent application made by Sean Corcoran, which was rejected by the patent examiner.

The core of the Corcoran design is a sheet of flexible plastic material with a plurality of vertical slits in one side of the material. They form continuous lines of reduced thickness, but do not extend through the entire depth of the vinyl. These slits make it possible to tear the material along the lines without distorting the separated edges. Tabs are interposed between the slits at one end of the sheet. These tabs extend through the entire thickness of the shade material so that they can be grasped and a corresponding sheet of shade material peeled off. The design includes a roller adapted to be adjusted in length and a horizontal bottom rail which can also be adjusted in length.

### (c) Differences from Prior Art.

No item of prior art teaches a tear shade mounted on a telescoping roller by adhesive means. The vinyl material disclosed in the 770 patent is, however, identical to the Corcoran material. In addition, the roller on which the material is mounted closely resembles the roller revealed in Rice, in that both teach a telescoping roller with two sections which lock together through the use of grooves and ridges. Moreover, while Gossling does not teach the adhesive means used by the 770 patent to secure the top of his shade directly to both sections of a telescoping roller, the 1965 Gossling patent does teach the adhesive attachment of a shade directly to the outer roller section and to a tube of cuttable material surrounding the inner roller section. The claimed invention differs from the prior art by teaching a slat pocket seamed intermittently, so that the seam does not overlap the lines of weakness in the fabric.

### (d) Level of Ordinary Skill.

The typical person working in window shade design at the time of the claimed invention possessed a bachelor's degree, although not necessarily in engineering. Thomas Ferguson, inventor of the shade in question, holds a bachelor's degree in business and economics. Paul Comeau, who worked on development of Defendant's shade, has an associate's degree in business administration, but did take engineering courses at the Franklin Institute of Technology in Boston and Lowell Institute of Technology in Lowell. Other witnesses presented by both sides have engineering backgrounds, although not all possess degrees in that field.[6]

---

6. Qualifications of other witnesses involved in the manufacture of window shades at the time of the alleged invention follow. David Wright, operations manager for Kenney, is an industrial

At trial, the Court admitted a 1967 memo from Vincent Sordillo to G. Dickson Kenney. This memo, which was admitted for the limited purpose of illustrating the ordinary level of skill in the field, referred to the design of a do-it-yourself window shade. The memo contemplated two types of shades: a lightweight, inexpensive shade and a heavy opaque one. The shade material would contain vertical lines of fine perforation spaced evenly across the material. The consumer was to tear the shade to the desired width along these perforations. Tear tabs would facilitate adjusting the width of the heavy shade. The shade was to be attached to a metal telescoping roller, the inner tube of which would be covered with cardboard perforated to match the tear lines in the shade material. Although Kenney and Sordillo discussed the concept, no further research was undertaken at that time.

■ The memo's contents cannot be considered prior art, since it was kept "in-house" at Kenney and never made available to anyone outside the company. *Cf. Grinnell Corp. v. Virginia Electric & Power Co.*, 277 F.Supp. 507, 518 (E.D.Va. 1967), *aff'd*, 401 F.2d 451 (4th Cir.1968) (holding that design concealed until inventor learned of plaintiff's design and applied for a patent was not prior art). However, it is indicative of the level of ability of the average person working in the field of window shade design in 1974.

In light of the above evidence, a reasonable jury only could find that the level of ordinary skill in the art of making window shades in 1974 was that of an individual with a college education and a technical background not necessarily amounting to a college degree in engineering. This person would be capable of designing a shade such

as the one described in Vincent Sordillo's memo.

(e) Secondary Factors

■ Secondary factors which must be taken into consideration when dealing with the issue of obviousness of a claimed invention are commercial success, longfelt but unsolved need, and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

Plaintiff, as already indicated, introduced evidence of the commercial success of the window shade. Although figures for only 1981–1983, the period at issue between the parties to this lawsuit, were submitted, these figures are indicative of the public acceptance the product has achieved. In 1981 Newell manufactured 4,451,973 do-it-yourself-without-tools shades, in 1982, 4,360,028 shades and in 1983, 3,841,117. The number of shades manufactured by Plaintiff has decreased over this time period: however, this does not reflect a growing consumer disenchantment with the Plaintiff's shade. Rather, it indicates that sales by Newell have decreased as competitors have entered the market. Neither party refutes this theory.

There was no evidence that others skilled in the art tried and failed to find a solution to the problems preventing in-home fitting of window shades once the Corcoran material was introduced. Instead, the evidence showed that the industry resisted the advance represented by the Corcoran material. Thomas Ferguson stated that Newell began manufacturing the do-it-yourself-without-tools shade because Breneman, a shade manufacturer which manufactured other items for Newell, declined to produce the shade on the grounds that it believed the product would fail in the marketplace.

engineer with an associate's degree in machine design from Wentworth Institute of Technology and a bachelor of science degree in mechanical engineering from the University of Rhode Island. Vincent Sordillo, Kenney's engineering manager, holds a degree in chemical engineering from Northeastern University. John Donofrio, who worked for Joanna-Western, one of

the major competitors in the industry, has a bachelor of science degree in industrial management and industrial relations with a minor in industrial engineering. His degree is from the Illinois Institute of Technology.

In addition, Harold Huggins, who joined Newell as vice president in 1978, has a bachelor of science degree in engineering administration.

In addition, Plaintiff introduced deposition testimony of William Uecker, Kenney's senior vice president, which was taken by Plaintiff's counsel. Although currently employed by the Defendant, Uecker was employed for many years by Joanna-Western, becoming Joanna-Western's vice president of sales in 1972 and president of the company in 1975. During his tenure, Joanna-Western was the largest manufacturer of window shades in the United States and possibly the world, with annual revenues of 100 million dollars. When Sean Corcoran approached Joanna-Western in 1972 with an offer to license the manufacture of his shade material or sell the material to it, the company declined the offer. In its case Defendant introduced testimony from the same deposition as to Joanna-Western's reasons for deciding against Corcoran's material.

Q. And then you went on to say: "We at Joanna felt that Mr. Corcoran's product would detract from the sales of cloth shades, which we considered to be far superior," et cetera. Who is the we in the "we at Joanna felt"?

A. I think the entire Joanna organization felt that our, it was in our best interestes [sic] to sell cloth window shades. That was the "we," the entire marketing organization. And our primary objective was to sell cloth window shades. And why we were selling vinyl window shades is we had to. We would leave no stone unturned to enhance cloth over and above vinyl.

Q. I see. I take it implicit is you get a better price for cloth than you do for vinyl; right?

A. Not only that. The entire company was, you know, was founded on cloth. We had enormous investment in cloth processing equipment; we owned our own cotton mill.

Uecker deposition, page 40.

(f) Resolution

■ The elements contained in claims 1, 2 and 6 are all found in the prior art discussed *supra.* However this does not in any way negate the validity of the claims.

Indeed, the theory that a so-called combination patent, i.e., one which is comprised of known elements, is a separate and distinct type of patent clearly has been put to rest. *See Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1566 (Fed.Cir. 1983). An invention must be viewed as a whole, rather than as a collection of parts. *Jones v. Hardy,* 727 F.2d 1524, 1529 (Fed. Cir.1984). It is also important to remember that, while the differences between a claimed invention and the prior art must be considered when determining validity, it is not these differences which comprise the invention; rather, one looks at the device itself. *Id.* at 1528. As stated earlier, any so-called "secondary" factors must also be considered. It now appears that such objective evidence of nonobviousness has been elevated from the "secondary" status accorded it in *Graham v. John Deere Company,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966) to "highly probative, objective criteria fully capable of serving as a foundation for the legal conclusion of unobviousness." *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 895–96 (Fed.Cir.1984) (quoting *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 961 (Fed.Cir. 1983)).

■ Examination of all factors persuades the Court that the claims at issue must be declared obvious and thus invalid. The shade material described in claims 1, 2 and 6 is that devised by Sean Corcoran. When Thomas Ferguson first saw the material he knew that it was intended to be used as a window shade. In his letter to Ferguson of February 25, 1974, Corcoran indicated that he was attaching the material to wooden rollers which were capable of being adjusted in length. He suggested that Ferguson could obtain rollers more cheaply in the United States, but the material quite clearly was intended to be hung from a roller.

The conclusion of obviousness is buttressed by the opinion of the United States Court of Customs and Patent Appeals. *In re Corcoran,* 640 F.2d 1331 (C.C.P.A.1981). In that case the court affirmed the rejec-

tion by the Patent and Trademark Office Board of Appeals of claims in Corcoran's patent application. Corcoran had attempted to patent his shade material hung from a wooden roller. The Court based its decision on the fact that the design had been published more than a year before a patent application was made. However, the court also noted,

As to the support means we conclude that, given the plastic sheet shade material denominated a "window shade," nothing could be more obvious than to attach it to a roller or other support.

*Id.* at 1334.

The fact that Thomas Ferguson placed the vinyl shade material on a telescoping roller rather than a wooden one does not avoid a finding of obviousness. The purpose of using a vinyl material scored vertically and supplied with pull tabs is to make it easier to decrease the width of the shade itself. Given the nature of the shade material, it would be obvious to one with ordinary skill in the art to mount the shade material on a telescoping roller, well known in the art, which could be quickly shortened to match the width of the shade. Like the *Corcoran* court, this Court feels that "... nothing could be more obvious...." *See id.*

Claim 7, unlike claims 1, 2 and 6, discloses something which clearly is Thomas Ferguson's own idea; more accurately, it represents Mrs. Ferguson's input. The claim teaches a slat pocket seamed intermittently so that the areas of seaming do not overlap the vertical slits in the material. This style of slat pocket is not found in the prior art, although a continuously seamed pocket is present. Corcoran himself found it necessary to cut through the slat pocket with scissors or other implement. However, once again the claim must be looked at through the eyes of one with ordinary skill in the art. At the time of the invention, such a person would have been faced with a piece of vinyl shade material containing vertical slits. It would have been clear that, in order to be used most efficaciously, the strips should be capable of being re-

moved in a single motion. Providing gaps in the securement of the slat pocket so as to have the slits free of interference would have been fundamental, even obvious, to a person with ordinary skill in the art as that person has already been defined by this Court.

The Plaintiff introduced evidence of commercial success and copying. This evidence is unrefuted. However, it must be viewed in light of other evidence not disputed by the Plaintiff. The window shade industry is a very old one which apparently moves at a pace akin to that of a snail. When taken as a whole, the evidence reveals a sluggish industry attempting to pursue "business as usual" rather than meet consumers' needs. Undoubtedly, the industry was surprised by the success of the do-it-yourself-without-tools shade. Certainly it jumped on the band wagon when it realized the potential profits to be recognized. However, in this case such copying does not equal nonobviousness of the claimed invention. Joanna-Western, the largest company in the field, would have preferred to suppress the invention to protect its cloth interests. Other members of the industry were satisfied with perpetuating old practices. The companies, including Plaintiff, spent little on research and development. This is a case of a sales and marketing specialist anticipating the needs of the public. He was fortunate to be supported in his vision by higher management. While Newell has benefitted from Ferguson's acuity, this does not in any way mandate a finding of nonobviousness.

Evaluation of all these factors leads the Court to the conclusion that reasonable jurors could not reach any other conclusion than that claims 1, 2, 6 and 7 of the 770 patent are obvious and ergo invalid. Defendant's motion for a directed verdict on the issue of obviousness is granted.

### INFRINGEMENT OF PATENT

Defendant Kenney's motion for a directed verdict also is grounded upon the argument that even if the 770 patent is valid, the claims at issue are not infringed

by Defendant's accused device. As already noted, the Court will decide this issue of Defendant's motion as if it had found the 770 patent valid. Since the infringement determination is a question of fact, *SSIH Equipment S.A. v. United States International Trade Commission*, 718 F.2d 365, 376 (Fed.Cir.1983), when addressing this issue the Court must decide whether reasonable jurors could conclude that the claims at issue were infringed. *See Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1511–12 (Fed.Cir.1984).

A patent gives the patent holder the right to exclude others from making, using, or selling the patented invention throughout the United States for seventeen years. 35 U.S.C. § 154 (1982). Whoever makes, uses or sells the invention during the patent's term without authority, infringes the patent. 35 U.S.C. § 271(a) (1982).

 In deciding whether patent infringement has occurred, two determinations must be made: (1) the scope of the claims at issue, and (2) whether the claimed invention has been infringed. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671 (Fed. Cir.1984). The first determination involving the scope of the claims has already been made, since a claim must be construed the same when determining infringement as when determining validity. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed.Cir.1983). The Court will proceed to address the second determination.

 Two types of infringement must be considered: literal infringement and infringement under the doctrine of equivalents. In order to decide whether a device literally infringes a claim, the claim must be read on the accused device. If the accused matter clearly falls within the claim, infringement is established. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). A claim will not "read on" any device unless that device contains every element of the claim. *Cimiotti Unhairing Co. v. American Fur Refining Co.*, 198 U.S. 399, 410, 25 S.Ct.

697, 702, 49 L.Ed. 1100 (1905); *Wolens v. F.W. Woolworth Co.*, 703 F.2d 983, 987 (7th Cir.1983).

 The doctrine of equivalents is considered only if actual literal infringement has not been found. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir.1983). Under this doctrine, an accused product may infringe a claim "if it performs substantially the same function in substantially the same way to obtain the same result" as the claimed product. *Graver Tank, supra* 339 U.S. at 608, 70 S.Ct. at 856. Any element which one of ordinary skill in the art would view as interchangeable with the claimed element is an equivalent. *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579 (Fed.Cir.1983).

 The operation of the doctrine of equivalents is restricted, however, by another doctrine: the doctrine of prosecution history estoppel. The doctrine of prosecution history estoppel precludes a patent holder from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of the patent application. *Hughes Aircraft, supra* at 1362. The estoppel applies to both claim amendments, *id.*, and to the cancellation of claims, *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1966); *Arco Industries Corp. v. Chemcast Corp.*, 633 F.2d 435, 440 (6th Cir.1980), which were made to overcome rejections based on prior art, as well as to arguments which were submitted to obtain the patent. *Hughes Aircraft, supra* at 1362. A patent that has been severely limited to avoid the prior art will have only a small range between it and the point beyond which it violates prosecution history estoppel. *Hughes Aircraft, supra* at 1363.

## THE INFRINGEMENT EVIDENCE

 Plaintiff Newell claims that the Kenney window shade infringes claims 1, 2, 6 and 7 of Newell's 770 patent. The accused shade consists of a lock seam telescoping roller with spring motor, plastic

shade material with invisible pre-slit vertical lines, and a plastic bottom slat with lines of weakness which permit it to be broken off. The shade material is adhesively secured only to the outer section of the telescoping roller, with one or more extra wraps of shade material being employed to hold the shade on the inner roller section.

One of the elements of claim 1 of the 770 patent, as construed *supra*, is that the shade material must be attached to both the outer and the inner roller sections by adhesive. Since the accused window shade lacks an adhesive means of securing the shade material to the inner roller section, instead using extra wraps of material to perform this function, it is clear that the Kenney shade does not, and could not, literally infringe claim 1 of the 770 patent. Similarly, the Kenney shade does not literally infringe claims 2, 6 or 7 of the 770 patent because these dependent claims incorporate the elements of claim 1 by reference.

Lacking proof of literal infringement, the remaining question is whether the Kenney window shade is the equivalent of the shade claimed by the 770 patent: specifically, whether the Kenney shade contains an equivalent of the "securement means" element of claim 1 which was found to be lacking in a literal form. In order for the Kenney shade to be an equivalent of the window shade taught by claim 1 of the 770 patent, Kenney's use of extra wraps to hold the shade material to the inner roller section must perform substantially the same function in substantially the same way to obtain the same result as a shade where the material is adhesively secured to the exposed portion of the inner roller section with a substantially constant force from point to point, when interpreted in light of the prior art.

Under the doctrine of prosecution history estoppel, the Kenney wraps cannot be equivalent to the adhesive of the patented shade. This is because of the amendment and accompanying arguments which Ferguson made in order to overcome a prior art rejection while prosecuting his patent.

In claim 1 of Ferguson's original patent application, he claimed a window shade with a "means for attaching" the shade material to the telescoping roller sections. This claim was rejected by the patent examiner on the grounds of obviousness, with the examiner noting that pertinent prior art included the 1965 and 1967 Gossling patents. These Gossling patents contain claims which teach adhesive means of attachment whereby the shade material is directly attached by adhesive only to the outer section of the telescoping roller.

In response, Ferguson amended his patent application, deleting his claim to a broad "means for attaching" the window shade to the roller, and substituting narrower language about "adhesive surfaces on external wall surfaces of said inner and outer sections [of the telescoping roller] for adhesively securing one end section of said sheet [the shade material] to said inner and said outer telescoping sections" in order to distinguish his claimed invention from the prior art. Ferguson argued that "the prior art does not disclose a telescoping roller with adhesive surfaces for securing the sheet to the roller." By so arguing, Ferguson abandoned any claim to a nonadhesive means of securing the shade to either of the telescoping roller sections. This limitation, once voluntarily imposed by Ferguson, accompanied his patent application through one more series of amendments and cancellation of claims, when present claim 1 was substituted for the adhesive attachment claim.

The language of claim 1, as ultimately allowed by the examiner, further limited the form of adhesive attachment ("securement means") to one which provides "a substantially constant securing force from point to point along the length of the portion of the second roller section which extends beyond the end of the first roller section." The equivalents of the "securement means" element of claim 1 of the 770 patent as allowed cannot include any nonadhesive securement means because this

would resurrect subject matter surrendered by Ferguson via both claim language and arguments in his first amended application.

Since it is undisputed that the accused Kenney shade does not contain an adhesive mode of attaching the shade material to the inner roller section, the Kenney window shade cannot infringe claim 1 of the 770 patent under the doctrine of equivalents, and no reasonable jury could find otherwise.

The remaining claims upon which Plaintiff Newell grounds its allegations of infringement, namely claims 2, 6 and 7, are claims which are dependent upon claim 1. Thus these remaining claims cannot be infringed under the doctrine of equivalents if claim 1 is not infringed.

The difference between a window shade where the shade material is held to the inner section of the telescoping roller by adhesive and a window shade where it is held by extra wraps of material may seem insignificant. This distinction is important, though, since a patentee is granted the exclusive right to practice an invention and its equivalents only to the extent that his patent claims were allowed by the Patent Office. The purpose of creating this right is to encourage invention and its disclosure to the public. *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 322 U.S. 471, 484, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399 (1944).

While a patent teaching a pioneer invention is entitled to a broad range of equivalents, a patent which teaches an invention representing a much more modest advance over the prior art, such as the 770 patent at issue, is allowed only a narrow range of equivalents. *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1580 (Fed.Cir.1983). Hence when a patentee claims such an improvement over an earlier invention, competitors are free to practice variations of that prior invention so long as the variations are not the same as, or equivalents of, the improvement claimed by the patentee. *Id. See also Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583 (Fed.Cir.1984). Newell's competitors, including Defendant Kenney, are entitled to design and manufacture variations of window shades which are not the same as, or the equivalents of, the shade taught by the 770 patent. The Kenney shade at issue here is a permissible, noninfringing window shade.

## CONCLUSION

Defendant's motion for a directed verdict on the issue of the validity of U.S. Letters Patent No. 4,006,770 due to obviousness is granted, as is Defendant's alternative motion for a directed verdict on the issue of noninfringement of the patent by the Kenney window shade. The Court hereby denies Plaintiff's motion for a directed verdict, as well as its post-trial motions for a permanent injunction and interest. Judgment will enter for Defendant.

SO ORDERED.