David A. TIMMINGTON, Plaintiff,

v.

The UNITED STATES,* Defendant.

No. 5–89C.

United States Court of Federal Claims.

Sept. 28, 1993.

Branko Stupar and David S. Healy, Washington, DC, for plaintiff.

Carl M. DeFranco, Jr., Washington, DC, with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. Janice M. Mueller, Dept. of Justice, of counsel.

* Editors Note: This opinion was originally published at 29 Fed.Cl. 308. It is published here to include the appendix.

## OPINION

MARGOLIS, Judge.

Plaintiff, David A. Timmington, brought suit in this court pursuant to 28 U.S.C. § 1498(a), seeking damages for defendant's alleged infringement of plaintiff's patent under the doctrine of equivalents. Defendant, United States, argues that there is no infringement and that the patent is invalid. After a four-day trial in Washington, D.C. and after careful examination of the entire record, this court finds that defendant has failed to establish by clear and convincing evidence that plaintiff's patent is invalid and that defendant has not infringed plaintiff's patent.

## BACKGROUND

The United States Patents and Trademarks Office ("Patent Office") issued to plaintiff, David A. Timmington, U.S.Patent No. 4,510,032 on April 9, 1985 ("the Timmington patent"). Timmington claims priority for his patent, under 35 U.S.C. § 119, based on the filing dates of his two British patent applications: No. 8232420 filed November 12, 1982, and No. 8306518 filed March 9, 1983. The Timmington patent discloses a sacrificial anode which is designed to protect a link of mooring chain ("link" or "stud link") from corrosion when immersed in sea water ("the Timmington anode" or "the claimed device"). See Appendix, Exhibit A. The Timmington anode occupies an area above the link. The anode is sized and shaped so that it fastens to the link's stud without encroaching on the loop openings or interfering with the flexing and running of the chain. The anode is attached to the stud by legs that are cast into the anodic material. These legs wrap around the stud and are welded in place. The anode design permits divers to replace expended anodes while the mooring chain remains submerged. Timmington and his company, Griffin–Woodhouse Limited, entered into a licensing agreement giving Impalloy Limited the exclusive world-wide right to manufacture the patented anodes.

In 1982, defendant United States, through the Naval Facilities Engineering Command ("the Navy" or "NAVFAC") and VSE Corporation, designed an anode for cathodic protection of stud link chain used in its fleet moorings ("the Navy anode," "the Navy's device" or "the accused device"). See Exhibit B (depicting the device shown in NAVFAC drawing No. 3026376) and Def.'s Ex. DX–15. The Navy anode also occupies an area above the link. The anode is sized and shaped so that it fastens to the link's stud without encroaching on the loop openings or interfering with the flexing and running of the chain. The anode is attached to the stud by a galvanized bolt[1] inserted through a galvanized bushing that is cast into the anodic material. A hole is tapped in the stud to accept the bolt. The Navy's design also permits divers to replace expended anodes while the mooring chain is submerged. The Navy purchased anodes and attachment bolts conforming to NAVFAC purchase description No. OED–85–02 from Belmont Metals, Inc., under contract N62578–87–C–7066 dated September 29, 1987 ("the Belmont contract"), and from Thermal Reduction Corporation, under contract N62578–88–C–8035 dated September 26, 1988 ("the TRC contract").

## DISCUSSION

As a result of the Navy's purchases under the Belmont and TRC contracts, Timmington filed suit in this court, under 28 U.S.C. § 1498(a) and 35 U.S.C. § 271(a)-(c), alleging that the Navy's use and manufacture of the Navy anodes without plaintiff's permission infringed Claims 1, 2, 3 and 6 of the Timmington patent under the doctrine of equivalents. Defendant denies that its anodic protection system for mooring chain infringes Timmington's patent and counters that, in any event, the Timmington patent is invalid for obviousness. The court addresses the validity issue first.

### Validity—Obviousness

Defendant asserts that the Timmington invention is invalid because it

---

1. The Navy's purchase specification and drawing call for "screws" to attach the anode to the stud. The documents, however, refer repeatedly to "bolts" and "bolting." This court finds that "screw" and "bolt," as used in this litigation, are interchangeable terms.

would have been obvious to a person of ordinary skill in the art at the time it was made. *See* 35 U.S.C. § 103. A patent is presumed valid. 35 U.S.C. § 282. To have the patent declared invalid for obviousness, defendant has the burden of establishing obviousness by clear and convincing evidence. *Id.; Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1575 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

To meet this burden, defendant advances three prior art references that were not considered by the Patent Office during prosecution of the Timmington patent: the Baldt engineering drawings; the Morgan patent; and the Morgan book. Defendant argues that the claimed invention is unpatentable because these prior art references show all of the elements of the claimed invention and suggest their combination to a person of ordinary skill in the art.[2] *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1023–25 (Fed.Cir.1985).

Defendant first submits that the Baldt engineering drawings, Def.'s Exs. DX–4 and DX–5, anticipate all but the transverse portions of the claimed invention. Specifically, the Baldt drawings show an anode with leg-like protrusions tack welded into a large cavity in a specially-designed stud. According to defendant, the Baldt anode fits against the stud, does not interfere with the flexing and running of the chain, and may be replaced while the chain is immersed. Plaintiff counters that the Baldt device is not more pertinent than the device disclosed in the Debost patent, Def.'s Ex. DX–20, that the patent examiner considered during prosecution of the Timmington patent. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1566 (Fed.Cir.1983). According to plaintiff, the Baldt stud-cavity anode, like the Debost device, achieves non-interference in flexing

and running of the chain by replacing a portion of the steel stud with anodic material and retaining the spatial shape of a non-protected stud.[3]

Defendant next submits that the transverse portions of the Timmington anode are anticipated by the Morgan patent, Def.'s Ex. DX–2, which relates to dumbbell-shaped anodes for cathodic protection of ship's tanks. According to defendant, this patent teaches that "[s]uch an anode will lose zinc from the ends faster than from the middle, so that the zinc tends to decay to a uniform thickness around the rod. The anode can thereby provide a constant current, and be less liable to fracture than an ordinary bar anode." Def.'s Ex. DX–2 at 2. Plaintiff counters that the corrosion problem addressed by the Morgan patent (which was concerned with the danger of a falling anode striking steel, and thereby producing a spark that might ignite inflammable oil carried in the tank) does not bear on the non-interference problem addressed by the claimed invention. Plaintiff adds that, unlike the dumbbell anode, the claimed device's transverse portions are thinner than the central portion.

Finally, defendant submits a book authored by the inventor of the Morgan patent. John H. Morgan, *Cathodic Protection* (1960) (hereinafter "the Morgan book"); *see* Def.'s Ex. DX–1. Defendant asserts that the Morgan book teaches (1) an anode which has an insert for legs to connect it to the protected structure, and (2) the direct attachment of an anode to a small object such as a chain link. Thus, defendant contends, the Morgan book teaches the combination of the Baldt and Morgan patents. Plaintiff asserts that, notwithstanding the Morgan book, defendant did not establish any teaching, suggestion, or incentive for the combination of

---

**2.** Plaintiff states that in 1982, few people were trained in cathodic protection *per se.* Those working in cathodic protection had their training in other related disciplines such as electrical, mechanical, or marine engineering. Defendant's expert at trial supplemented his bachelor of science in metallurgical engineering with later courses in corrosion. Plaintiff's expert earned his doctorate in electrochemistry.

**3.** Plaintiff also counters that the Baldt drawings do not constitute prior art because the unpatented and unmanufactured concept was concealed, never reduced to practice, and apparently abandoned, within the meaning of 35 U.S.C. §§ 102(g), 103.

prior art references that it cites. The references fail to suggest the manner or place of attachment of the anodes, and their preferred size and shape, particularly as these considerations relate to the spatial constraints placed on anode geometry due to flexing and running of the chain.

The court finds that all of the relevant prior art falls into one of two categories. One category describes chain anodes that protect individual links by fitting within the existing link geometry. This is accomplished by either creating a cavity in the stud for insertion of an anode (Baldt) or bonding anodic material to a stud of reduced cross-section (Debost). Both of these alternatives require the chain to be specially manufactured or modified to accommodate cathodic protection, and both involve weakening the link by removing stud material.

The second category describes small or geometrically-similar anodes intended for attachment to marine structures, such as buoys, tanks, and bilge keels, that do not present the same spatial interference problems encountered in deploying mooring chain (Morgan). Even accepting defendant's contention that the references would have suggested the possibility of attaching small anodes directly to small objects such as a chain link (which indeed was practiced by attaching clump anodes at intervals along the chain or substituting regular links with a number of enlarged links employing cast-on anodic material), they fail to anticipate the ability to preserve flexing and running of the mooring chain. The installation and operating profile for mooring chain is distinct from the profiles of even seemingly-comparable underwater devices such as chain net (Waite patent, Def.'s Ex. DX–24) or stretched chain (Drisko patent, Def.'s Ex. DX–28) due to differences in the methods for storage and emplacement, and the inter-link motions generated while the system is deployed.

Plaintiff also proffers evidence of commercial success, a secondary consideration bearing on obviousness. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1144 (Fed.Cir.1985). Plaintiff represents, primarily through testimony, that Impalloy produced anodes under the agreement, Griffin–Woodhouse sold anodes to various customers, and plaintiff received royalties. Defendant questions whether Timmington produced any credible evidence of products sold. The court considers that the testimony, supported by price quotations for the Timmington anode, supports plaintiff's contention that the claimed device has attained some degree of commercial success.

Based on the evidence before it, this court concludes that conventional wisdom in cathodic protection, as it applied to mooring chain, did not teach Timmington's invention. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir. 1985) ("A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom...."). The Court of Appeals for the Federal Circuit has held that:

Virtually all inventions are necessarily combinations of old elements. The notion, therefore, that combination claims can be declared invalid merely upon finding similar elements in separate prior patents would necessarily destroy virtually all patents and cannot be the law under the statute, § 103.

*Panduit Corp.*, 810 F.2d at 1575 (footnotes omitted). The court finds that no prior art reference or combination of references presented in the course of this litigation would suggest to a person of ordinary skill in cathodic protection that an anodic structure could be attached to a chain link without either displacing some of the chain material or interfering with flexing and running of the chain.

Accordingly, the court finds that the Timmington stud-mounted anode represents a substantial advance over the prior art in that it recognizes a geometrically-defined area, not within the link, within which it is possible to affix a sacrificial anode that does not interfere with link-on-link movements or compromise the chain's handling characteristics. The court holds that defendant has not carried its burden of establishing that the Timmington patent is invalid due to obviousness of the inven-

tion, within the meaning of 35 U.S.C. § 103. *See Panduit Corp.*, 810 F.2d at 1569.

*Infringement—The Doctrine of Equivalents*

■ Timmington does not claim that the Navy literally infringed his patent; instead he bases his infringement claim on the doctrine of equivalents. The doctrine of equivalents is intended to prevent an infringer from stealing the benefit of an invention by enabling the patentee to proceed against the producer of a device "if [the] two devices do the same work in substantially the same way, and accomplish substantially the same result." *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (citing L. Hand in *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 692 (2d Cir.), *cert. denied*, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948)).

■ For plaintiff to succeed under the doctrine of equivalents, he must prove by a preponderance of the evidence that "[a]n equivalent [can] be found for *every limitation of the claim* somewhere in [the] accused device...." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989) (emphasis added); *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985). "Only if all limitations of the claim are satisfied at least equivalently can it be found that the two devices work 'in substantially the same way.'" *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed.Cir.1990) (quoting *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856; other citations omitted).

Independent Claim 1 of the Timmington patent requires:

A chain comprising a series of interconnected metal chain links, each link comprising a loop portion and a transverse central stud, with an opening on each side of the stud, and at least one link comprising at least one anode member composed of a metal which in corrosive conditions is consumed in preference to the metal of which the link is composed, characterized in that the anode member

(A) does not interfere appreciably with flexing and running of the chain in that the anode member is *in the form of a wafer fitted against* one side of a link, said wafer comprising

(a) *an elongated central portion* [14] *which fits against an outward facing side of said stud* [12], extends throughout the length of the stud, and has a width not greater than the width of the stud so that it does not encroach on said openings, and

(b) *two transverse portions* [15], each of which is integral with the central portion, *extends on both sides of the central portion substantially beyond the width of the central portions, fits against an outward-facing side of said loop* [18, 20], and does not encroach on said openings, and

(B) can be removed and replaced while the chain remains immersed in use, in that *said wafer is connected to said link by means comprising a pair of legs* [24] *projecting from said central portion and extending on both sides of said stud* [12], said legs being composed of metal other than the metal of the anode member.

Pl.'s Ex. PX–1 at A5 (emphasis supplied; bracketed numbers refer to Appendix, Exhibit A). Claims 2, 3, and 6 are dependent on Claim 1.[4]

----

4. Claims 2, 3, and 6 require:
   2. A chain as claimed in claim 1 in which each link has at least one of said anode members associated with it.
   3. A chain as claimed in claim 1 in which one or more anode members are provided on individual chain links at spaced intervals over the length of the chain.

. . . .

6. A chain as claimed in claim 1 in which the connecting means is partially embedded into the wafer of anode material so as to secure the connecting means to the anode member. Pl.'s Ex. PX–1 at A–5.

736

*Practicing the Prior Art*

The court first considers defendant's assertion that the broad range of equivalents plaintiff claims for his device encroaches on the prior art, and accordingly, in manufacturing and using the accused device, the Navy was merely practicing the prior art. 35 U.S.C. § 102. *See We Care, Inc. v. Ultra–Mark Int'l Corp.*, 930 F.2d 1567, 1571 (Fed.Cir.1991); *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683 (Fed.Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990).

Defendant asserts that, to design the accused device, the Navy just modified the Style–A ZEP heat exchanger anode disclosed in Military Specification MIL–A–18001H (Amend. 1) ("the ZEP–A device"), for mounting on a chain link, as suggested by the Morgan book. *See* Def.'s Ex. DX–3. The ZEP–A device is basically a large, square anode wafer with a cast-in bushing or core. Defendant alleges that the Navy cut the ZEP–A device to fit the mooring chain application.

For reasons analogous to those stated earlier in this opinion, the court rejects the notion that the Navy was practicing the prior art. The accused device adopts the teaching of the Timmington patent which limits the anode's size and shape in relation to the stud link so that it does not interfere with the flexing and running of the chain. If the design for the accused device is indeed based on the ZEP–A device, the Navy modified radically its dimensions and shape from a six-by-six-by-one inch square, to a trapezoid having a rectangular base and two large sloping ends. Indeed, aside from a squarish shape and a galvanized bushing, it is difficult to determine the similarity between the ZEP–A device and Navy device.

The court also agrees with plaintiff that, by virtue of its gross geometry and placement within the "sphere of the link" (within an area that does not interfere with flexing and running of the chain), the Navy anode bears a closer resemblance to the embodiment of the claimed invention than it does to either the Baldt or Debost concepts. "[W]hile the rectangular shape permits the anode of the accused device to overl[a]y the stud without encroaching on the loop openings … its slopes prevent the [attached] anode … from sticking out into an area where it would likely interfere with the running of the chain." Pl.'s Proposed Findings, para. 86.

In sum, a finding of equivalence is not precluded by defendant's mistaken belief that, in manufacturing and using the accused device, the Navy was practicing the prior art.

*Attachment Mechanism*

The court next addresses defendant's assertion that its device differs from the patented invention under the doctrine of equivalents because its attachment mechanism differs. Defendant argues that the Navy's device performs differently because the electrical connection between anode and link is different. According to defendant, material differences also arise from the way the device is installed on or removed from the link.

Claim 1 describes the attachment mechanism for the claimed device as two metal legs projecting from the central portion and extending on either side of the stud. The legs wrap all or part way around the stud (depending on the design configuration employed). *See* Appendix, Exhibit A, Figs. 2 and 4.

Defendant first argues that its device has no legs. In the Navy's device, a bolt passing through a cylindrical bushing connects the anode and the link. Plaintiff argues, however, that the bushing and bolt combination of the accused device is the functional equivalent of the legs on the claimed device. *See Corning Glass Works*, 868 F.2d at 1259 (stating that the equivalent for a claim limitation need not be found in the corresponding component). Plaintiff maintains that the interchangeability of welding and bolting to connect a sacrificial anode to the protected structure was well known at the time of the infringement. Thus, plaintiff reasons, defendant's use of bolts is substantially equivalent to plaintiff's welding of legs to the stud.

Defendant counters that Timmington represented to the patent examiner that the legs "do not form part of the chain structure." Pl.'s Ex. 2 at 31. In contrast, defendant asserts that the Navy anode is designed as part of an integral system that includes specially-made links (having threaded bolt holes). The Supreme Court has stated that:

Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Graver Tank,* 339 U.S. at 609, 70 S.Ct. at 857. The court sees no reason to prevent a finding of equivalency for this claim limitation based on the substitution of bolts for legs as a means of mechanically attaching the anode to the stud.

Defendant's next argument is that the Navy design provides electrical continuity between anode and link in a substantially different way. The patent describes electrical connectivity which is facilitated in part by spot welds attaching the anode's legs to the stud and in part by metal-to-metal contact between the anode and the link.[5] As the claimed anode and link remain immersed in water, corrosion will, over time, cause the anode to loosen on the stud and interfere with electrical connectivity provided through metal-to-metal contact. Thus, the court finds that the primary means of providing electrical contact in the claimed device is through the spot welding of the anode legs to the stud. The court finds no basis for differentiating the Navy anode's bushing and bolt combination, which likewise provides a firm, continuous electrical connection throughout the

life of the anode. The court therefore concludes that a finding of equivalency is not prevented by these minor differences in electrical connection mechanisms.

Defendant's remaining arguments relating to the attachment mechanism center on the means of installing or removing it compared to the patent's requirements. Specifically, the patent stresses that one object of Timmington's invention is to "provide an anode member which can be readily retrofitted to existing chain while the latter is immersed." Exhibit PX–1 at A4. Anode members are "provided with means connecting them to the links so as to enable their removal from the links without breaking or otherwise modifying the links." *Id.*

■ Much contention between the parties involves the feasibility and relative ease of accomplishing anode attachment through underwater welding or underwater bolting using divers. Infringement cannot be avoided, however, by the mere fact that the accused device is more or less efficient. *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 402 (10th Cir.1965), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). The court finds that divers are capable of performing both operations, and the claimed and accused devices cannot be differentiated on this basis.

Defendant argues that its anode, as part of an integral cathodic protection system, requires each link be specially modified to accept the Navy anode. Defendant continues that the anodes may be used only on modified Navy chain, not any chain as is suggested by the patent language. Some chain links are, however, manufactured with a hole tapped in the stud. It is the court's understanding that, to install the accused device on deployed (submerged), unmodified chain, the chain would have to be removed from the water so that a hole could be tapped in each stud. Accordingly,

5. Defendant argues vigorously that the spot welds shown on Appendix, Exhibit A, Figures 2 and 4 of the patent's preferred embodiments do not attach the legs to the stud, but merely attach the two legs to each other. This argument must fail. "The U-shaped connector element ... may be a strip of ferrous metal" which likely would

be stiff enough to secure the anode in Figure 2 to the stud without any need to weld the extremities. Pl.'s Ex. PX–1 at A4. Thus, this court concludes that the primary purpose of the spot welds shown in Figures 2 and 4 is to provide an electrical connection between anode and stud.

on this narrow ground alone, the court finds some evidence of non-equivalence in attachment mechanisms. The court finds, however, that this is not a sufficient basis on which to hold for defendant under the doctrine of equivalents.

### Configuration of Device

■ Finally, this court considers defendant's assertion that several claim limitations respecting the physical configuration of the claimed device prevent this court's finding of infringement under the doctrine of equivalents. These limitations include the "fits against" requirement respecting the anode's physical proximity to the stud and the loop, and the "transverse portions" requirement. According to defendant, these physical features are a product of the patent specification and, in certain instances, the prosecution history. Thus, these features must be demonstrated either literally or by non-disclaimed equivalent, in the accused device to show infringement. *Corning Glass Works*, 868 F.2d at 1259; *Standard Oil Co.*, 774 F.2d at 452.

Claim 1 requires the anode to have a central portion that "fits against" the stud. This direct metal-to-metal contact between the anodic material of the claimed device and the stud forms an electrical connection between anode and link for which no equivalent exists in the Navy's device.

Defendant represents that contact between the anodic material and the link could accelerate corrosion of the anode or short-circuit the electrical connection between the anode and the link. Accordingly, the Navy expressly prevents the anodic material of the accused device from contacting the stud. The Navy drawing identifies an offset which is created by allowing the attachment bushing to protrude between 0.12 and 0.50 inches from the bottom of the anodic material, depending on the anode size (dimension E). *See* Appendix, Exhibit B, p. 2 and Def.'s Ex. DX–15. Thus, no portion of the Navy anode, either literally or equivalently, "fits against" the

stud. Accordingly, the Navy's device contains no equivalent for this claim limitation.

Claim 1 also requires the anode to have two transverse portions. The purpose of the transverse portions in the claimed device is to extend the life of the anode by providing additional anodic material. Defendant asserts that the accused device has no structure which is equivalent to the transverse portions and, consequently, it operates in a substantially different way. Plaintiff argues that the large sloping ends of the accused device are equivalent to the transverse portions because they maximize the available anodic material while staying within the "sphere of the link." Actually, the sloping portions of the accused device show the removal of anodic material, so that what is basically a rectangular anode will not impair the flexing and running of the chain.

Even accepting, *arguendo*, that the sloping portions are the functional equivalent of the transverse portions, the sloping portions must satisfy two physical limitations placed on the transverse portions of the claimed device. Both of these limitations in the claim language arose during prosecution of the claim before the patent office and were material to allowance of the patent. Accordingly, the court must find these features in the accused device, either literally or equivalently, in a form that was not disclaimed during prosecution of the patent. *Standard Oil Co.*, 774 F.2d at 452 (stating that "the prosecution history (or file wrapper) limits the interpretation of the claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance").

The first limitation is that the transverse portions must extend "substantially beyond" the width of the central portion. To attempt to meet this requirement, plaintiff argues that the Navy anode incorporates a taper of up to three degrees in the vertical direction which satisfies the "substantially beyond" requirement.[6] Appendix, Exhibit

---

6. This taper enables the manufacturer to remove the Navy's anode from the mold after it is cast. Plaintiff's expert admitted that he would

need calipers or a micrometer to measure this taper in the accused device.

B, p. 2. Plaintiff admits that the taper makes the sloping ends no more than "slightly wider than the central portion."

During prosecution of the patent, the patent examiner rejected the more liberal wording of "comprises at each end a cross-piece which has its ends extending beyond the width of the central portion" as insufficient to differentiate Debost. According to the examiner, the enlarged ends of Debost's cast-on-the-stud anode could be construed as "cross-pieces." Timmington adopted the more stringent "transverse portion" and "substantially beyond" language to circumvent Debost. Thus, the court finds that, during prosecution of his patent, Timmington disclaimed an equivalent device that would exhibit only "slight" widening of the transverse portions. Accordingly, the Navy's device contains no equivalent for this claim limitation.

The second limitation is that the transverse portions must "fit against" the outward facing portion of the loop. During prosecution of the patent, the patent examiner rejected the more liberal wording of "lies against an outward-facing side of the link" as insufficient to differentiate Debost. Thus, the court finds that Timmington disclaimed any equivalent device that does not fit against the loop.

Plaintiff asserts that when the Navy anode is bolted to the stud, the sloping ends of the anode "overlie" portions of the loop. Even assuming that the Navy anode does overlie the loop portion of the link by some slight amount, it in no way "fits against" the loop, being separated from the loop by the offset created by the bushing. Thus, the court finds that the accused device does not incorporate the claim limitation of transverse portions fitting against the loop.

The court finds that the accused device fails to incorporate important claim limitations, either literally or equivalently. This court therefore holds that defendant has not infringed independent Claim 1 of the Timmington patent under the doctrine of equivalents. *Corning Glass Works*, 868 F.2d at 1259. Accordingly, this court also holds that defendant has not infringed dependent Claims 2, 3, or 6 of the Timmington patent under the doctrine of equivalents. *Becton Dickinson & Co.*, 922 F.2d at 798 ("The holding of noninfringement of [C]laim 1 applies as well to all claims dependent on [C]laim 1").

## CONCLUSION

The court finds that defendant has failed to establish by clear and convincing evidence that plaintiff's patent is invalid and that plaintiff has not proven infringement by a preponderance of the evidence. The clerk will enter judgment for defendant. No costs.

740

**U.S. Patent**   Apr. 9, 1985      Sheet 1 of 2      4,510,032

Fig. 1

Fig. 2

Appendix—Continued

U.S. Patent    Apr. 9, 1985    Sheet 2 of 2    4,510,032

Fig. 3

Fig. 4

| KEY | |
|-----|-----|
| Ref. No. | Definition |
| 12 | stud |
| 14 | central portion |
| 15 | transverse portions |
| 18, 20 | loop |
| 24 | legs |

Appendix—Continued

**Exhibit B** (page 1 of 2)

743

undefinedAppendix—Continued

Exhibit B (page 2 of 2)

SEE NOTE 4

DETAIL ①

BUSHING .